**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**JASXBREEN MASSEY**,

        Plaintiff,

  v.                                 **Case No. 13-cv-137-pp**

**JUDY P. SMITH, TOM EDWARDS,**
**SUE SMITH, HENRY BRUNEEL,**
**CAPTAIN BLODGETT, SERGEANT GOH,**
**SGT. LOGTERMAN, SGT. PRIEST,**
**CO II DORDEL, WENDY CARVIOU, and**
**CHARLES HUIBREGTSE,**

        Defendants.

---

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

The *pro se* plaintiff, Jasxbreen Massey, is a Wisconsin state prisoner. His complaint alleges that the defendants acted with deliberate indifference to his serious medical need, in violation of the Eighth Amendment to the United States Constitution. The defendants filed a motion for summary judgment, which is now fully briefed. For the reasons stated below, the court grants the defendants' motion in part, and denies it in part.

1

I.    **FACTS**[1]

A.    Parties

During the time of the events he alleges in the complaint, the plaintiff
was a prisoner in the Wisconsin Department of Corrections (DOC), incarcerated
at Oshkosh Correctional Institution (OSCI).

All of the defendants were DOC employees during that same time period.
Defendant Judy Smith was the warden of OSCI.  She has held this position
since September of 1996.  Although Warden Smith has the general supervisory
authority over OSCI operations, she does not supervise the day-to-day
operations of individual employees.

Defendants Susan Smith, Tom Edwards, Henry Bruneel, and Wendy
Carviou were nurse clinicians in OSCI's Health Services Unit (HSU).  Their
responsibilities included assessing and treating patients, assisting the
physician in providing medical services, managing medications, providing
emergency care, and maintaining medical records.

Defendants Sherry Goh and Jordan Priest were correctional sergeants at
OSCI.  Defendants Harold Logterman and Corinne Dordel were OSCI
correctional officers.  At the time relevant to the plaintiff's claim, defendant
Rebecca Blodgett was employed at OSCI as a supervising officer 2 (captain).

Defendant Charles Huibregtse, M.D., who has been licensed to practice
medicine in the State of Wisconsin since June 4, 1999, was employed by the

---

[1] The court takes the facts from the Defendants' Proposed Findings of Fact (ECF
No. 87), the plaintiff's "Disputes" to the Defendants' Proposed Findings of Fact (ECF
No. 101), the plaintiff's Declaration (ECF No. 103), and the plaintiff's Exhibits (ECF
No. 104).  The facts in this section are undisputed unless otherwise indicated.

2

DOC's Bureau of Health Services as a physician at the Redgranite Correctional Institution (RGCI). Dr. Huibregtse attends to the medical needs of inmates, diagnoses and treats illness and injuries, and arranges for professional consultation when warranted. Occasionally, Dr. Huibregtse is scheduled as the on-call physician for patient care of inmates. He is not on-site at OSCI. While on call, Dr. Huibregtse may get a telephone call from nursing staff at another institution about an inmate's medical issue. The nurse will relate to Dr. Huibregtse the findings from his or her exam, and Dr. Huibregtse will determine needed care based on the information provided. If the inmate has an emergent need requiring immediate medical attention, Dr. Huibregtse will direct the inmate be sent off-site for emergency medical services.

B.  Accessing Medical Care[2]

If an inmate requires non-emergency medical attention, he must submit a Health Services Request (HSR) to the HSU. Inmates may ask to "see HSU" by checking the box on the HSR that indicates their desire to see health services staff. The inmate also may indicate if he does not need to see health services staff by checking the corresponding box.

Nursing staff triages and responds to HSRs on a daily basis. If nursing staff determines that the request is urgent or emergent in nature,

---

[2] According to the defendants, the OSCI inmate handbook, which inmates are given when they enter OSCI, sets forth the procedure that inmates should follow to access medical care. The plaintiff asserts that inmates no longer receive the inmate handbook. The plaintiff does not allege, however, that he did not know about the procedure for accessing health care at OSCI, and the question of whether he did or did not receive the handbook is not relevant to the plaintiff's claim that the defendants were deliberately indifferent to his serious medical needs.

3

arrangements will be made for a same-day appointment for evaluation by a health care provider.

Inmates are told that if they need to see medical staff immediately (emergency-type situations), they need to alert unit staff of their problem or concern. An emergency is defined as a potentially life threatening medical condition.

C.    Medical Care of the Plaintiff

The events described in the plaintiff's complaint took place over the course of a long weekend. The events started with the plaintiff asking to see the health services staff on a Thursday, and ended with a doctor's diagnosis of an abscess the following Monday. During that five-day period, the plaintiff had various contacts with the nurse defendants, the correctional sergeants and officers, and the doctor described above. He alleges that all of those individuals, as well as the warden of OSCI, were deliberately indifferent to his serious medical needs.

1.    *Thursday, November 19, 2009*

The plaintiff submitted a HSR dated November 19, 2009, asking to see HSU staff for his complaints of right testicle pain and pain when he sat down.

2.    *Friday, November 20, 2009*

The next day, on November 20, 2009, Nurse Bruneel met with the plaintiff for his complaints of right side testicular and rectum pain. The plaintiff informed Nurse Bruneel that he had been having the testicular and rectum pain for two days, and rated his pain as a 6-7 on the 10-point pain

4

scale. He described the pain as dull, and stated that the rectum pain increased and became sharp with movement. The plaintiff said he'd had no changes in the right testicle in the last couple of days, and that he had not had any recent trauma to the area. On visual inspection, Nurse Bruneel noted no signs or symptoms of acute or gross abnormality.

Based on his exam, Nurse Bruneel prescribed APAP (acetaminophen), interchangeable with Ibuprofen, for pain, and scheduled a follow-up with the physician for Monday, November 23, 2009. Nurse Bruneel noted that he had advised the plaintiff to inform HSU staff if his pain increased. Nurse Bruneel had no further involvement in the plaintiff's claims.

According to the plaintiff, he did not receive a rectal exam during this visit, "supposedly because the on-site physicians were gone for the weekend." (Massey Decl. ¶ 5) The plaintiff alleges that Nurse Bruneel told him, "If you could've gotten down here earlier, I probably could have gotten a doctor to see you." Id. The plaintiff further says that Nurse Bruneel explained that the plaintiff would have to wait until at least the following Monday, "or possibly even Tuesday," to see a doctor for further examination. Id.

### 3. Saturday, November 21, 2009

The plaintiff alleges that on November 21, 2009, at approximately 5:20 p.m., Nurse Edwards refused to see him after unit security staff called the HSU regarding the plaintiff's complaints of pain. According to the plaintiff,

> About 5:20 p.m., the plaintiff, in tears due to the excruciating pain he was in, went to the officer station as both the dosage level and frequency of the pain relievers prescribed by Defendant Bruneel were not working.

5

When informed of this, CO II Kubisiak called HSU where he spoke with Defendant Edwards who outright refused to see the plaintiff because he was examined the previous day. Defendant Edwards said to CO II Kubisiak, "If he wants to see us tomorrow, he'll have to fill out another medical request slip." Once again, just like the previous night, the plaintiff spent the overnight hours in absolute sleeplessness only this time it was more pronounced.

(Massey Decl. ¶ 7)

Nurse Edwards does not recall this incident. According to Nurse Edwards, if he had received a call from unit staff on November 21, 2009, stating that the plaintiff was in pain, he would have questioned unit staff about the plaintiff's condition and reviewed his medical chart. To Nurse Edwards' knowledge and based on his review of the record, Nurse Edwards would have told unit staff to direct the plaintiff to fill out the proper HSR form because he had been prescribed pain medication on November 20, 2009 and, according to Edwards, because his complaints were "non-emergent." In general, Nurse Edwards always recommended that the inmate utilize the standard procedure of filling out a HSR form in non-emergency situations.

The plaintiff disputes that his condition was "non-emergent." He asserts that his medical condition was sudden and unexpected, which made it emergent in nature.

### 4. Sunday, November 22, 2009

The plaintiff alleges that during third shift at approximately 1:00 a.m. November 22, 2009, he approached the officer station to see if security staff could do anything about his pain. It had, by this point, been four days since the plaintiff had submitted his HSR. He says that Officer Dordel told him that

6

nothing could be done until 6:00 a.m.—five hours later—when HSU staff came on duty. The plaintiff alleges that Officer Priest was present when he spoke with Dordel, but did nothing.

Officer Dordel does not recall this incident. To Dordel's knowledge, the HSU did not have staff on duty during third shift. When an inmate requests medical attention, Officer Dordel usually advises the inmate to submit a HSR for non-emergency needs. If an inmate complains of severe pain during third shift, Dordel alerts her supervising officer. The supervising officer then contacts the appropriate staff to determine what action is necessary. Officer Dordel does not recall contacting her supervising officer that night about the plaintiff's alleged complaints. Dordel believes either that the plaintiff did not complain of severe pain or that she did not conclude that his complaints rose to the level of an emergency.

According to the plaintiff, he was complaining of extreme pain and suffering. The plaintiff submitted declarations from twenty-five witnesses, twenty-two of whom were inmates living on the same unit as the plaintiff during the relevant time period. (*See* ECF No. 104-3, Massey Exh. 204) The witnesses declare that the plaintiff was obviously in extreme pain and should have been sent to the hospital. [3]

---

[3] For example, inmate James Thorpe states that over the weekend of November 20, 2009, the plaintiff "was moaning loudly in pain and hurt and he couldn't even walk during this time." (ECF No. 104-3 at 2) Inmate Eric Fleming states that he witnessed the plaintiff "go through so much pain" and that Fleming "helped him get up he was yelling because he hurt so bad." (ECF No. 104-3 at 3) Inmate Michael Storzer states that he "noticed the plaintiff to be in unbearable pain[,]" he "was suffering and in misery[,]" and "[i]t was obvious to me and anyone else that the plaintiff needed to see a

7

The plaintiff submitted a HSR, which the HSU received on November 22, 2009, stating that his symptoms were getting worse and asking to be seen by HSU staff "A.S.A.P." (S. Smith Decl. ¶ 15; Exh. 101 at 2)

On that same day, November 22, 2009, Officer Logterman worked first shift—from 6:30 a.m. to 2:30 p.m.—on the K-East Unit. The plaintiff alleges that during that same first shift period, he complained of increasing pain to Officer Logterman, and the plaintiff alleges that Officer Logterman made him wait approximately two hours and fifteen minutes to see HSU staff. CO Logterman does recall the plaintiff making complaints of pain. According to Logterman, when the plaintiff approached him at 6:30 a.m., the plaintiff told Logterman that he had submitted an HSR. Logterman states that he told the plaintiff that the nurse had just arrived, and would process the HSR.

The plaintiff disputes this. He alleges that he approached Officer Logterman at 6:10 a.m., before Logterman's shift began. Logterman told the plaintiff that the nurses did not arrive until 6:30 a.m. The plaintiff says that at about 6:30 a.m., he spoke with Officer Logterman, still trying to get to the HSU. Officer Logterman said, "I have to serve breakfast now. You'll have to wait." (Massey Decl. ¶ 10) The plaintiff also alleges that at about 7:25 a.m., he went

---

doctor." (ECF No. 104-3 at 4) Inmate Jason Martin states he saw the plaintiff "double-over in extreme pain[,]" "hunched over and walking slow[,]" and that when "he ask[ed] at the officer station with the sgt., he received no attention to his pain or medical need." (ECF No. 104-3 at 5.) Inmate Michael Lawrence states that the plaintiff's "moans of pain [were] heard through out [sic] the day room area causing inmates to also voice their concern for his welfare[,] that Lawrence "voiced my concern to staff while in my treatment program, and I wrote on an event sheet on the subject for my treatment because it really disturbed me." (ECF No. 104-3 at 12)

8

to Logterman, only to be rebuffed again when Logterman said, "It'll be count time soon (7:30 a.m.). You'll will [sic] have to wait until count clears." (Massey Decl. ¶ 11)

According to Logterman, when an inmate requests medical attention, Logterman usually tells the inmate to submit a HSR for non-emergency needs. According to Officer Logterman, if an inmate complains of severe pain during his shift, he alerts the supervising officer and contacts the HSU staff. On November 22, 2009, Officer Logterman contacted HSU nursing staff and reported the plaintiff's complaints of pain, but he does not recall the time. (Nurse Smith received a call from the "Unit Sergeant" at 9:25 a.m.)

It is undisputed that when the plaintiff didn't hear from the HSU, Logterman called HSU. Logterman would then have left a message on the nurse's voice mail or talked directly to the nurse. Logterman does not recall if he talked directly to the nurse or if he left a voice mail on November 22, 2009. Whether Logterman left a voice mail or talked directly to the nurse, the nurse would have notified Logterman when to bring the plaintiff to HSU. After the nurse contacted Logterman that she was ready to see the plaintiff on November 22, 2009, staff directed the plaintiff to the HSU for his exam.

At approximately 9:25 a.m., Nurse Smith received a call from the "Unit Sergeant" who stated that the plaintiff had complaints of pain. The plaintiff arrived in the HSU in a wheelchair. The plaintiff told Nurse Smith that he had been having pain for approximately one week. He said that the pain had started in his right testicle, but that in the past two to three days, the pain had

9

"referred" to his rectum. (Defs.' Exh. 101 at 3-4) Nurse Smith noted that there was no redness or swelling, and that the plaintiff had been able to play volleyball despite the "injury." The plaintiff claimed his last bowel movement had been two to two and one-half days prior, that he had the urge to go but was unable to, and that he usually went at least once a day. The plaintiff further stated that his appetite had decreased due to pain and that the pain worsened with movement.

On exam, Nurse Smith found the plaintiff's abdomen flat and firm, with slight tenderness to palpation. Bowel sounds were active in all four quadrants, and there was no rebound tenderness. Nurse Smith conducted a pelvic/rectal check, with Mark Hinchley in the room. Nurse Smith noted that the right testicle was normal in appearance with slight tenderness to touch. She examined the rectal area but noted no abnormality, though the plaintiff noted slight pain in the area palpated. Nurse Smith specifically looked for a peri-anal abscess and did not see one.

Nurse Smith called the on-call physician, Dr. Huibregtse, about the plaintiff's complaints of pain, and discussed the plaintiff's history with him. To Dr. Huibregtse's knowledge and based on review of the records, Nurse Smith would have told him of the plaintiff's symptoms and OSCI nursing staff's findings, that:

       1)    Massey reported having pain for approximately 1 week starting in his right testicle but had referred to his rectum over the last 2 to 3 days;

       2)    No redness or swelling was noted and Massey was able to play volleyball despite the injury;

10

3) Massey claimed his last bowel movement had been 2 to 2 ½ days prior and that he had the urge to go but was unable to and that he usually went at least once a day;

4) Massey stated that his appetite had decreased due to pain and that the pain worsened with movement;

5) Massey's abdomen was flat, firm, with slight tenderness to palpation;

6) Bowel sounds were active in all four quadrants, and there was no rebound tenderness;

7) A pelvic/rectal check was done and the right testicle was noted to be normal in appearance with slight tenderness to touch;

8) The rectal area was visualized with no abnormality noted, and slight pain in area palpated; and

9) No peri-anal abscess was seen on exam.

(Huibregtse Decl. ¶ 17, Exh. 101, pgs. 3-4, 7)

Dr. Huibregtse ordered doxycycline 100 mg twice a day for ten days; Tylenol #3 (acetaminophen with codeine), one to two tablets four times a day as needed for three days; and a follow-up with the nurse practitioner for November 23, 2009. It was and is Dr. Huibregtse's opinion, to a reasonable degree of medical certainty, that the plaintiff's medical condition did not require off-site emergency services at that time.

At approximately 10:20 a.m., Nurse Smith gave the plaintiff two tablets of Tylenol #3 and encouraged him to drink water for a necessary urine sample. Nurse Smith had the plaintiff temporarily housed in the HSU until he could produce a urine sample. At approximately 11:00 a.m., the plaintiff provided a urine sample, and Nurse Smith performed a dip test. A urine dip test is a fast way to get a basic urinalysis. The dip test showed no abnormality. Nurse

11

Smith encouraged the plaintiff to eat 25 to 50% of his meal. The plaintiff said he hadn't vomited.

According to the plaintiff, at 11:00 a.m., he told Nurse Smith that he was still in horrible pain after taking the two tablets of Tylenol #3 at 10:20 a.m. Nurse Smith responded "that those particular pain relievers are not designed for peak performance until the one-hour mark after they have been taken." (Massey Decl. ¶ 16)

In contrast, Nurse Smith states that at 11:00 a.m., the plaintiff reported that the pain medication had helped decrease his pain to a 3 out of 10 on a pain scale, and Nurse Smith reviewed medication use of narcotics and antibiotics with him. Nurse Smith had no further involvement regarding plaintiff's claims.

The plaintiff alleges that several hours later, at approximately 4:35 p.m., he reported to Sergeant Goh that the pain medication prescribed to him was not working, and that he was developing symptoms of nausea. The plaintiff alleges that Goh's response was to tell him to lay down in his room. According to the plaintiff, he told Sergeant Goh three times in a row that he was experiencing severe pain and was suffering, as well as developing symptoms of nausea (he says that he approached Goh with a bucket in hand). (Massey Decl. ¶ 18) The plaintiff also alleges that as he turned toward his room, he vomited in his bucket and hurried toward the bathroom. Officer Kubisiak accompanied him to the bathroom to monitor and console him. At one point, Kubisiak had to catch the plaintiff as he started to collapse.

12

Goh does not recall this incident. According to Goh, when an inmate requests medical attention, he usually advises the inmate to submit a HSR for non-emergency needs. If an inmate complains of severe pain during Goh's shift, she alerts her supervising officer and contacts the HSU staff. The HSU staff and supervising officer then make the determination as to necessary action. Goh does not recall contacting her supervising officer or HSU staff about the plaintiff's alleged complaints. Goh therefore concludes either that the plaintiff did not complain of severe pain or that she did not conclude that his complaints rose to the level of an emergency.

At approximately 8:25 p.m.—four hours later—Nurse Edwards saw the plaintiff for his complaints of rectal pain. After a check of his vital signs, the plaintiff reported increased rectal pain from the morning exam, but a little less right testicle pain. The plaintiff told Nurse Edwards that he was able to urinate, but could not defecate despite an urge to do so. The plaintiff reported having vomited around 3:30 p.m. that day, and said that when he vomited, one pain pill came up and one stayed down. The plaintiff acknowledged eating some lunch and a quarter of his evening meal, but reported that he had not taken any pain medication since the 3:30 p.m. dose. The plaintiff stated that he experienced some pain relief from his 10:20 a.m. dose, which dropped the pain from an 8 to 3 on the pain scale. The plaintiff denied abdominal or back pain or any other changes.

On exam, Nurse Edwards found that the right testicle felt swollen compared to the left testicle, but noted nothing unusual about the rectum. The

13

rectal vault was empty of stool. The plaintiff had complaints of pain with finger insertion and pressing down towards the prostate and complained of sharp pain with palpation of the testicle. The plaintiff's abdomen was flat, and he stated that the pain came in "waves" rectally but did disappear periodically, intermittently. (Edwards Suppl. Decl. ¶ 19)[4]

Nurse Edwards called the on-call physician, Dr. Huibregtse, regarding the plaintiff's complaints of rectal and right testicle pain, but Dr. Huibregtse ordered no change from the previous orders. To Dr. Huibregtse's knowledge and based on review of the records, OSCI nursing staff would have informed Dr. Huibregtse of the plaintiff's symptoms and their findings, that:

1) Massey was able to urinate but could not defecate despite an urge to do so;

2) Massey reported vomiting around 3:30 p.m. that day and that when he vomited, one pain pill came up and one stayed down;

3) Massey said he experienced some pain relief from his 10:20 a.m. dose, which dropped the pain from an 8 to 3 on the pain scale;

4) Massey denied abdominal or back pain or any other changes;

5) The right testicle felt swollen compared to the left testicle and nothing unusual about the rectum was noted;

6) The rectal vault was empty of stool;

7) Massey had complaints of pain with finger insertion and pressing down towards the prostate and complained of sharp pain with palpation of the testicle; and

8) Massey's abdomen was flat and he stated that the pain came in "waves" rectally but did disappear periodically, intermittently.

---

[4] The plaintiff "contends that defendant Edwards['] rectal exam was poorly done and did not fully concentrate on the exact area of pain." (Massey Decl. ¶ 21)

14

(Huibregtse Decl. ¶ 20; Exh. 101, pg. 5)  It was and is Dr. Huibregtse's opinion, to a reasonable degree of medical certainty, that the plaintiff's medical condition did not require off-site emergency services at that time. Dr. Huibregtse had no further involvement regarding the allegations of the plaintiff's complaint.

Nurse Edwards discussed with the plaintiff the need to eat something when taking his medication so he didn't get nauseated.

5.    *Monday, November 23, 2009*

The plaintiff alleges that during third shift in the morning of November 23, 2009, he complained of increasing pain, and Officer Dordel informed him, "All nurses are gone for the night; there is nothing we can do. The only way you can get sent to the hospital on third shift is by a nurse okaying it or by passing out or bleeding." (Dordel Suppl. Decl. ¶ 6)  Dordel does not recall this incident and asserts that she did not, and would not, respond as the plaintiff claims she did.

According to Officer Dordel, based on her review of the Unit Log Book for November 23, 2009, the plaintiff complained to staff that he was in pain. Lieutenant Goh was notified of the plaintiff's complaints and staff monitored him.  If an inmate complains of severe pain during third shift, and it appears to be urgent or emergent, Officer Dordel tells her sergeant and supervisor to discuss the need for contacting medical staff.  To Dordel's knowledge and based on her review of the records, nursing staff was contacted regarding the plaintiff's complaints during third shift the morning of November 23, 2009, and

15

nursing staff determined that off-site medical treatment was not necessary at that time.

During that same third shift period on November 23, 2009, the plaintiff alleges, he complained of increasing pain, but Captain Blodgett refused to send him to an outside provider, stating that OSCI has "a policy that if HSU doesn't send you out the only way I can is if you were bleeding and/or passed out." (Blodgett Decl. ¶ 5) Captain Blodgett says that he did not make that statement to the plaintiff.

At approximately 12:42 a.m. that morning, while conducting rounds, Sergeant Werner told Captain Blodgett that the plaintiff reported that the plaintiff was experiencing pain. Captain Blodgett contacted Nurse Edwards and reported the plaintiff's complaints of pain. Nurse Edwards told Blodgett that off-site medical care was not necessary.[5] Nurse Edwards had no further involvement in plaintiff's claims. Captain Blodgett directed unit staff to provide the plaintiff with his prescribed pain medications as needed and to monitor the plaintiff, as directed by Nurse Edwards.

The Log Book states: "Around 3:30 am, after taking pain meds at 1:45 am, Massey appears to be asleep!" (Defs.' Exh. 103 at 4)

An incident report by Sergeant Werner for the night in question states:

---

[5] Nurse Edwards does not recall this incident. According to Nurse Edwards, if he had received a call from unit staff on November 23, 2009, stating that the plaintiff was having pain, he would have questioned unit staff about his condition. Nurse Edwards further asserts that would have told unit staff to have the plaintiff fill out an HSR form and give him his prescribed pain medication as needed as his complaints appeared non-emergent.

16

> On the above date and time [11-23-09, 12:42 a.m.], I
> Sgt. Werner, contacted Lt. Goh about inmate Massey
> Jasxbreen #324766.  Complaining of sever[e] testical
> [sic] and anal pain.  I'm notified to monitor Massey
> threw out [sic] the night.  Capt. Blodgett while doing her
> round, called Edwards to see what could be done.
> Blodgett had me give Massey two pain pills, Massey was
> given his med's [sic] @ 1:45 a.m., Massey complained up
> to 2:56 a.m.  At 3:15 a.m. Massey appeared to be
> sleeping.  3:43 a.m. Massey was up and complaining of
> pain.  I helped him to his room, and set him on his
> bunk.  4:12 a.m. Massey appeared to be sleeping.
> Massey was checked on by myself, every 25 to 30 min.
> At 5:48 a.m. Massey again started complaining of
> sever[e] pain.  At 6:02 a.m. I help[ed] him to the
> bathroom and back to his room.  1st Shift notified of the
> pain Massey was feeling and notified of pain meds in
> box for Massey to take as needed every 4 hours.

(Defs.' Exh. 102 at 1-2)  The report states that Officer Dordel, Lieutenant Goh,

and Captain Blodgett were involved in the incident.  It also states that the

following actions were taken as a result of the incident:

> Nurse on call was contacted and apprised [of] inmate's
> condition.  She advised that inmate given his pain
> medication.  Inmate has appointment with HSU in the
> morning.

(Defs.' Exh. 102 at 2)

Several hours later, at approximately 8:45 a.m., Nurse Carviou—who was

working as the "Advanced Care Provider's RN Assistant" on Monday,

November 23—saw the plaintiff to prep him for his scheduled appointment with

Dr. Murphy.  The plaintiff said his pain level was an 8 out of 10.  Nurse

Carviou checked his vital signs and noted his medical history.  She also noted

on the HSR dated November 19, 2009, that he was being seen that day.

17

Moments after Nurse Carviou prepped the plaintiff, Dr. Murphy saw him for a sick call appointment for his complaints of increasing pain over the weekend of the right anus and right testicle. After the exam, Dr. Murphy assessed a pelvic abscess and ordered that the plaintiff be taken to the Mercy Medical Center emergency room for pain control and a CT scan. Nurse Carviou told the plaintiff of the "Physician's Order of NPO (nothing by mouth)," and told security staff he needed to be taken to the emergency room. Nurse Carviou had no further involvement in his claims.

Later that day, Dr. Robert Weber at the Mercy Medical Center diagnosed the plaintiff with "large right sided peri-rectal (same as peri-anal) abscess[6] with supralevator component and performed a drainage of the peri-rectal abscess

---

[6] Perirectal abscesses usually arise with indolent onset of constant, throbbing, acute anal pain associated with localized swelling, erythema and fluctuance. Perirectal abscess can be readily discriminated from other causes of acute anal pain such as anal fissure and thrombosed external hemorrhoid by history and gentle visual inspection. Pain often precludes a thorough digital rectal examination or anoscopic examination; however, neither of these is usually necessary in the acute setting. If the diagnosis is in question, an examination under anesthesia should be considered. The clinician should never attribute acute anal pain to thrombosed internal hemorrhoids or perianal cellulitis as these entities are extremely rare and misdiagnosis may allow occult anal sepsis to progress untreated.

. . .

A perianal abscess should be treated in a timely fashion by incision and drainage.

*See* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2780182/#r20102-3 (last visited May 27, 2015).

Case 2:13-cv-00137-PP Filed 06/04/15 Page 18 of 39 Document 107

into the rectum with Penrose drain placement." The plaintiff returned to OSCI three days later, on November 26, 2009.

### D. Off-Site Treatment Policy

According to the defendants, there is no OSCI policy specifically stating that an inmate cannot be sent to an outside hospital unless he was bleeding or unconscious. Inmates are sent out for emergency services for any number of reasons that have nothing to do with bleeding or loss of consciousness.

If the inmate has a medical concern that is determined to be life-threatening or beyond the capacity of the institution's on-duty HSU staff, the inmate will be sent out. For example, inmates who display symptoms of a potential heart attack or stroke are transported to a local emergency room.

If the inmate has a medical concern that is questionably life-threatening, the protocol is to notify the on-call nurse clinician or doctor, and he/she makes the decision as to medical treatment and whether the inmate needs to be sent out or not. Medical necessity is determined by the practitioner doing an exam and evaluating the inmate's needs in the institutional setting.

## II. DISCUSSION

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011).

19

"Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B.    Deliberate Indifference to a Serious Medical Need Law

"The Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (quoting *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009); *see also Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Prison officials violate the Constitution if they are deliberately indifferent to prisoners' serious medical needs. *Arnett*, 658 F.3d at 750 (citing *Estelle*, 429

20

U.S. at 104). A claim based on deficient medical care must demonstrate two elements: 1) an objectively serious medical condition; and 2) an official's deliberate indifference to that condition. *Arnett*, 658 F.3d at 750 (citation omitted). "'[D]eliberate indifference to serious medical needs' of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez*, 577 F.3d at 828 (quoting *Estelle*, 429 U.S. at 104).

      C.    <u>Application of the Law to the Facts of the Plaintiff's Case</u>

          1.    *The plaintiff had an objectively serious medical need.*

A medical need is considered sufficiently serious if the inmate's condition "'has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). "A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (citing *Reed v. McBride*, 178 F.3d 849, 852 (7th Cir. 1999)).

The defendants concede that the plaintiff suffered from an objectively serious medical condition – a "serious medical need" – between November 20 and 23, 2009. As a result, the plaintiff has satisfied the first element of an Eighth Amendment claim.

21

> 2. As to some allegations against some of the defendants, there
> are genuine disputes as to material facts, such that summary
> judgment is not appropriate.

The defendants contend that the court should grant their motion for summary judgment because the factual record does not support an inference that they were deliberately indifferent to the plaintiff's serious medical need. To demonstrate deliberate indifference, a plaintiff must show that the defendant "acted with a sufficiently culpable state of mind," something akin to recklessness. A prison official acts with a sufficiently culpable state of mind when he or she knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk. *Roe*, 631 F.3d at 857. A prison official cannot be found liable under the Eighth Amendment unless the official "'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "Deliberate indifference 'is more than negligence and approaches intentional wrongdoing.'" *Arnett*, 658 F.3d at 751 (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998)). It is not medical malpractice; "the Eighth Amendment does not codify common law torts." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008)(citation omitted).

"'A jury can infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional

22

standards as to raise the inference that it was not actually based on a medical judgment.'" *Arnett*, 658 F.3d at 751 (quoting *Duckworth*, 532 F.3d at 679). The physician's treatment decision is entitled to deference unless "no minimally competent professional would have so responded under those circumstances." *Roe*, 631 F.3d at 857 (quoting *Sain v. Wood*, 512 F.3d. 886, 894-95 (7th Cir. 2008)) (internal quotation marks omitted). A prisoner "need not prove that the prison officials intended, hoped for, or desired the harm that transpired." *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002) (internal quotation marks and citation omitted). "Nor does a prisoner need to show that he was literally ignored." *Arnett*, 658 F.3d at 751 (citing *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). That the prisoner received some treatment does not foreclose his deliberate indifference claim if the treatment received was "'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate his condition.'" *Arnett*, 658 F.3d at 751 (citing *Greeno*, 414 F.3d at 653). That being said, deliberate indifference is a high standard; it requires proof that the state officials actually knew of the inmate's serious medical need and that they disregarded it. *Walker*, 293 F.3d at 1037.

a.    *Nurses Carivou, Bruneel, Smith, and Edwards*

In his amended complaint, the plaintiff alleged that Nurse Carivou was deliberately indifferent to his serious medical needs because she "performed the initial screening on the plaintiff's health condition." (Am. Compl. at 3.) Yet, in his summary judgment pleadings, the plaintiff does not argue that Nurse Carivou acted with deliberate indifference. Perhaps this is because the record

23

provides no evidence that would support such a claim. Nurse Carivou had no role in analyzing or responding to the plaintiff's November 19 HSR. (Defs' Proposed Finding of Facts ¶ 31) She saw him only on November 23, when he came to the HSU to see Dr. Murphy. During that visit, she wrote on the November 19 HSR that the plaintiff had been seen on November 23. The plaintiff does not allege that Nurse Carivou did anything wrong during the November 23, 2009 visit with Dr. Murphy, and the record does not support a finding that she had anything to do with the November 19, 2009 HSR until she made a notation on it when the plaintiff came to the HSU on November 23. The record demonstrates that all Nurse Carivou did was spend some time prepping the plaintiff before his doctor visit—the visit at which he finally was diagnosed with an abscess. Because there is no evidence in the record, disputed or undisputed, indicating that Nurse Carivou was deliberately indifferent to the plaintiff's serious medical needs, the court will grant the defendants' motion for summary judgment as to Nurse Carivou.

The plaintiff contends that Nurses Smith, Edwards, and Bruneel violated his Eighth Amendment rights because they each saw the plaintiff, but did not send him to the hospital. According to the plaintiff, his medical situation was "emergent,"[7] the nurses had the authority to send him to a hospital, and instead they called Dr. Huibregtse.

---

[7] The parties define "emergent" differently. According to the defendants, an emergency is a life-threatening situation and inmates are told that if they have a medical emergency they should alert unit staff of their problem (instead of submitting an HSR). (The defendants also state that, if an inmate has a medical concern that is determined to be life-threatening *or beyond the capacity of the institution on-duty HSU staff, the*

24

Because they are medical professionals, the court can find that the nurse defendants were deliberately indifferent only if their treatment decisions were "such a substantial departure from accepted professional judgment, practice, or standards . . . as to demonstrate" that they were not relying "on a professional judgment." *Youngberg v. Romeo*, 457 U.S. 307, 314 (1982) (citation omitted)); *see Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008); *Collignon*, 163 F.3d at 987-88. Conduct that is akin to criminal recklessness— but not medical malpractice, negligence, or even gross negligence—violates the Eighth Amendment. *See Estelle*, 429 U.S. at 106; *Farmer*, 511 U.S. at 836; *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012).

> A prisoner may establish deliberate indifference by demonstrating that the treatment he received was "blatantly inappropriate." *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005) (quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)). Making that showing is not easy: "A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir.1998)). Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation. *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). The federal courts will not interfere with a doctor's decision to pursue a particular

inmate will be sent out.) The plaintiff, on the other hand, states that his medical need was emergent because it arose suddenly and unexpectedly. This dispute is not relevant to the question of whether the defendants were deliberately indifferent to the plaintiff's serious medical need—a plaintiff can have a serious medical need even if it is not "emergent" or an "emergency." Further, while the plaintiff alleges that the defendants failed to follow prison policy when they did not send him out, failure to follow policy is not a constitutional violation. *See Guajardo-Palma v. Martinson*, 622 F.3d 801, 806 (7th Cir. 2010).

> course of treatment unless that decision represents so
> significant a departure from accepted professional
> standards or practices that it calls into question whether
> the doctor actually was exercising his professional
> judgment. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir.
> 2011); *Sain*, 512 F.3d at 895.

*Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

Nurse Bruneel saw the plaintiff on Friday, November 20, 2009, the day after the plaintiff submitted his HSR. Bruneel examined the plaintiff and found no signs or symptoms of an acute or gross abnormality. Nurse Bruneel prescribed acetaminophen or ibuprofen for pain, and scheduled the plaintiff to see a physician three days later, on Monday, November 23, 2009. He also told the plaintiff to notify the HSU if his pain increased.

Even taken as true and undisputed, the most that these allegations could establish is that Nurse Bruneel may have failed to recognize the plaintiff's peri-rectal abscess. Because, as will be discussed later in this order, such abscesses may be difficult to find in a visual examination, it is not clear that such a failure would have constituted medical malpractice. Even if it had, however, "medical malpractice in the form of an incorrect diagnosis or improper treatment does not state an Eighth Amendment claim." *Gutierrez*, 111 F.3d at 1374 (doctor's incorrect assessment that cyst was not infected not actionable). Thus, there is no genuine dispute as to any material fact, and the plaintiff is not entitled to judgment as a matter of law. The court will grant the defendants' summary judgment motion as to Nurse Bruneel.

Turning to Nurses Edwards and Smith, the plaintiff alleges that on November 21, 2009, at 5:20 p.m., security staff called the HSU following the

Case 2:13-cv-00137-PP   Filed 06/04/15   Page 26 of 39   Document 107

plaintiff's report that he was in "excruciating pain," but Nurse Edwards refused to see him. Nurse Edwards responds that he does not recall this incident. He states that, if he had received such a call, he would have concluded that the plaintiff's condition was non-emergent, and that medical staff had recently seen the plaintiff and prescribed pain medication. According to Nurse Edwards, he would have told unit staff to have the plaintiff fill out an HSR form.

At 9:25 a.m. the next day, November 22, 2009, Nurse Smith received a call from the unit sergeant who said that the plaintiff was complaining of pain. This was sixteen hours after the plaintiff alleged "excruciating pain" to Nurse Edwards. Staff brought the plaintiff to the HSU in a wheelchair. The plaintiff told Nurse Smith he had been having pain for about one week, and that it had started in his right testicle but had moved to his rectum in the last two to three days. The plaintiff also told her that his last bowel movement had been two to two-and-one-half days prior, and that he had an urge to defecate but could not. Nurse Smith examined the plaintiff. She looked for a peri-rectal abscess and did not see one. Nurse Smith called Dr. Huibregtse, the on-call physician. He ordered Tylenol #3 and doxycycline as well as a follow-up with the nurse practitioner the next day. Nurse Smith gave the plaintiff the pain medication.

At 8:25 p.m. that night, Nurse Edwards saw the plaintiff, who reported increased rectal pain but less pain in his right testicle. Nurse Edwards examined the plaintiff and noted nothing unusual about the rectum, although his right testicle was swollen. He called Dr. Huibregtse, who ordered no change from his previous order.

27

The plaintiff contends that Nurse Edwards was deliberately indifferent for failing to see him on November 21, 2009. The plaintiff also contends that Nurses Edwards and Smith were deliberately indifferent because they refused to send him out of the institution on November 22, 2009, and instead called Dr. Huibregtse. The defendants, on the other hand, argue that the plaintiff merely alleges a difference of opinion in treatment. *See Budd v. Motley*, 711 F.3d 840, 844 (7th Cir. 2013) (affirming dismissal of deliberate-indifference claim because plaintiff, although dissatisfied with treatment, "received medical attention, medication, testing, and ongoing observation").

Under certain circumstances, a delay in treating even non-life threatening conditions can constitute deliberate indifference. *See Arnett*, 658 F.3d at 753 (delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain (citing *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010)). "'The length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment.'" *Smith v. Knox Cnty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012) (quoting *McGowan*, 612 F.3d at 640). Moreover, a few days' delay in addressing a severely painful but readily treatable condition states a deliberate indifference claim. *Id. Compare Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) (guards could be liable for delaying treatment of a broken nose for a day and a half and *Edwards v. Snyder*, 478 F.3d 827, 832 (7th Cir. 2007) (a plaintiff who painfully dislocated his finger and was needlessly denied treatment for two days stated a

28

deliberate-indifference claim, reversing the district court's dismissal) *with* *Gutierrez*, 111 F.3d at 1374 (no valid claim for a six-day delay in treating a mild cyst infection).

From the time the plaintiff alleges that he reported his pain to Nurse Edwards (5:20 a.m. on November 21) to the time the plaintiff was diagnosed (approximately 9:00 a.m. on November 23), over two full days passed. The plaintiff asserts that during this time, not only did he report his pain to Nurses Edwards and Smith, but also that it was obvious that he was in pain because, among other things, he yelled and moaned in pain, he was doubled over, and he couldn't walk. (*See generally,* ECF No. 104-3)

If, in fact, Nurse Edwards refused to see the plaintiff on November 21, 2009 despite evidence of extreme pain, such a refusal would have caused a delay in diagnosis and treatment of the plaintiff's abscess. Nurses Edwards and Smith, according to the plaintiff, saw what the plaintiff has characterized as his extreme pain and suffering. Add to this his witnesses' descriptions, i.e., that he obviously needed to go to the doctor, that he sounded like a wounded animal, that he was hunched over and couldn't walk, that staff ignored him, that his symptoms didn't change upon return from his visits to the HSU. Add also the facts that the pain medication the plaintiff was taking did not alleviate the pain, that he needed to have a bowel movement but couldn't, and that he vomited. This combination of alleged facts, if accepted by a reasonable finder of fact, could support a conclusion that these nurses were deliberately indifferent to the plaintiff's severe medical needs. *See Roe*, 631 F.3d at 857-58; *Greeno*,

29

414 F.3d at 653-54 (factfinder could infer deliberate indifference from medical defendants' "obdurate refusal" to alter prisoner's course of treatment despite his repeated reports that the medication was not working and his condition was getting worse); *see also Hayes v. Snyder*, 546 F.3d 516, 526 (7th Cir. 2008).

There also is the troubling issue of timing. The plaintiff alleges that when he saw Nurse Bruneel in the HSU on Friday, November 20, 2009, Bruneel told the plaintiff that if he had gotten to the HSU earlier he probably could have seen a doctor, but that now he would have to wait until Monday or Tuesday to see one. The reasonable inference to draw from this statement is that one of the reasons Nurses Edwards and Smith called the on-call doctor, rather than sending the plaintiff out for treatment, was because it was a weekend. If that is true—that the nurses called a doctor rather than sending the plaintiff out based on the fact that it was a weekend—that decision, on that basis, would have prolonged the plaintiff's pain, and delayed his treatment, by three days.

The court concludes that there are genuine disputes as to issues of material fact relating to Nurses Edwards and Smith: whether Nurse Edwards refused to see the plaintiff on November 20; whether the plaintiff displayed signs of extreme pain to Nurses Smith and Edwards; whether Nurses Smith and Edwards might have sent the plaintiff out for treatment sooner had it not been a weekend. Because these genuine issues of material fact exist, the court denies the defendants' motion for summary judgment as to Nurses Edwards and Smith.

30

### b.    Charles Huibregtse, M.D.

The facts demonstrate that on November 22, 2009, Dr. Huibregtse took two phone calls regarding the plaintiff.  The first call, from Nurse Smith, was in the morning.  She described the plaintiff's symptoms.  Based on her description, Dr. Huibregtse prescribed pain medication and ordered a follow-up with the nurse practitioner the next day.  He concluded that the plaintiff did not have an emergent need that required immediate medical attention.

Nurse Edwards placed the second call that evening.  He reported the plaintiff's symptoms, including the facts that pain medication had reduced the plaintiff's pain and that Nurse Edwards noted nothing unusual about his rectum.  Based on this information, Dr. Huibregtse again concluded that the plaintiff did not have an emergent medical need which required immediate attention.  He made no changes to his original order.

The defendants contend that Dr. Huibregtse is entitled to summary judgment because all he did was listen to the nurses' descriptions of the plaintiff's symptoms (which specifically addressed the possibility of a peri-rectal abscess), order medication that substantially decreased the plaintiff's pain, and make sure that the plaintiff would be examined by a provider the following day.

The plaintiff responds that Dr. Huibregtse violated his Eighth Amendment rights because, while Dr. Huibregtse received two telephone calls regarding the plaintiff's condition, and while he had the authority to send the plaintiff offsite to a hospital, he did not do so.  Specifically, the plaintiff alleges that Nurse Smith gave Dr. Huibregtse two contradictory statements: "Massey

31

was able to play volleyball despite the injury," and "the pain worsened with movement." He implies that this contradiction should have alerted Dr. Huibregtse that he could not rely on the information he was getting from the nurses. Further, the plaintiff alleges that some peri-rectal abscesses can be internal; one might not see the internal ones just by looking. Nurse Smith only looked at the rectal area. The plaintiff argues that Dr. Huibregtse also would have known that some peri-rectal abscesses are not visible on visual examination of the rectal area, again implying that Dr. Huibregtse should have suspected an abscess, and should not have made a treatment order based solely on Nurse Smith's visual examination. The plaintiff contends that Dr. Huibregtse should have, in the face of the reports he was getting, sent the plaintiff off-site for medical evaluation and treatment.

The essence of the plaintiff's argument is that Dr. Huibregtse committed malpractice, by failing to diagnose, or even suspect, the presence of an abscess. As the court has noted earlier, however, "medical malpractice in the form of an incorrect diagnosis or improper treatment does not state an Eighth Amendment claim." *Gutierrez*, 111 F.3d at 1374. The court already has concluded that Nurse Bruneel's failure to diagnose the abscess, even if it constituted malpractice, did not violate the Eighth Amendment. The court reaches the same conclusion with regard to Dr. Huibregtse.

> c. *Captain Blodgett, Sergeant Goh, Officers Priest, Logertman and Dordel*

The defendants contend that the plaintiff's claims against the security staff fail, because they were entitled to rely on the HSU staff to treat the

32

plaintiff and make decisions regarding his treatment. The plaintiff responds that Goh, Logterman, Dordel, Priest and Blodgett violated his Eighth Amendment rights.

Generally, non-medical professional defendants are entitled to rely on medical professionals' determinations regarding inmates' medical treatment. *See McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013) (citing *King*, 680 F.3d at 1018 (officers are "entitled to defer to the judgment of jail health professionals" so long as they do not ignore a detainee); *Arnett*, 658 F.3d at 755 ("Non-medical defendants . . . can rely on the expertise of medical personnel."); *Knight v. Wiseman*, 590 F.3d 458, 465 (7th Cir. 2009) (officers were entitled to rely on the fact that the prisoner had no medical work restrictions on his record to conclude that he "could work without endangering his health."). "The only exception to this rule is that nonmedical officers may be found deliberately indifferent if 'they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner.'" *McGee*, 721 F.3d at 483 (quoting *King*, 680 F.3d at 1018). At the same time, however, "[n]on-medical defendants cannot simply ignore an inmate's plight." *Arnett*, 658 F.3d at 755 (citing *Greeno*, 414 F.3d at 656).

Regarding Officer Dordel, the plaintiff alleges that at 1:00 a.m. on November 22, he approached Officer Dordel complaining that he was in extreme pain, and that Dordel told him that nothing could be done until 6:00 a.m. when HSU staff arrived. The plaintiff alleges that Officer Priest was present during his 1:00 a.m. conversation on November 22 with Officer Dordel.

33

The plaintiff alleges that Officer Priest did not do anything, but "just sat at the officers' station being deliberately indifferent" during his conversation with Dordel. In contrast, Officer Dordel responds that she does not recall this incident. She asserts she contacts her supervising officer if an inmate complains of severe pain during her shift. Officer Dordel also asserts that, since she does not recall contacting her supervising officer, either the plaintiff did not complain of severe pain or she did not think his complaints rose to the level of an emergency.

The above facts present genuine issues of material fact—whether the plaintiff approached Officer Dordel, whether he exhibited signs of extreme pain, whether—in the face of such evidence—she told the plaintiff that he could get no help for five hours, and whether Priest watched, and was aware, of all this, but did nothing. If a reasonable trier of fact were to accept the plaintiff's version of the facts, that trier of fact might also reasonably conclude that Dordel and Priest ignored the plaintiff's plight, in violation of the Eighth Amendment. *See Arnett*, 658 F.3d at 755 (citing *Greeno*, 414 F.3d at 656); *Windle v. City of Marion, Ind.*, 321 F.3d 658, 663 (7th Cir. 2003). The court denies summary judgment as to Officer Dordel and Officer Priest.

With regard to Officer Logterman, the plaintiff alleges that he contacted Officer Logterman at 6:10 a.m. on November 22, complaining of extreme pain and suffering. According to the plaintiff, Officer Logterman told the plaintiff that the nurses arrived at 6:30 a.m. When the plaintiff again contacted Logterman at 6:30 a.m., Logterman told the plaintiff that he would have to

Case 2:13-cv-00137-PP   Filed 06/04/15   Page 34 of 39   Document 107

wait, because Logterman had to serve breakfast. The plaintiff alleges that he

went to Logterman a third time at 7:25 a.m.; this time, Logterman told him

that it would be count time soon and that he would have to wait. Logterman

eventually did call HSU; he does not remember what time he called, but the

record reflects that HSU received a call from the "Unit Sergeant" (Logterman is

an officer) at 9:25 a.m.—three hours and 15 minutes after the plaintiff first

approached him.

Logterman's version of the facts differs from the plaintiff's. Logterman

indicates that when the plaintiff approached him the second time, at 6:30 a.m.,

the plaintiff told Logterman that he'd already submitted an HSR. Logterman

states that he responded by telling the plaintiff that the nurse had just arrived,

and would process that HSR.

Again, the court finds that there is a genuine dispute as to issues of

material fact—whether the plaintiff approached Officer Logterman showing

signs of severe distress, and whether Officer Logterman put the plaintiff off for

over three hours before finally contacting HSU. If a reasonable trier of fact were

to accept the plaintiff's version of the facts, that trier could conclude that

Logterman ignored his complaints of extreme pain and suffering for over three

hours on the morning of November 22, in violation of the Eighth Amendment.

The court denies the defendant's motion for summary judgment as to Officer

Logterman.

Turning to Sergeant Goh, the plaintiff alleges that at about 4:35 p.m. on

November 22, he told Goh that his pain medication was not working. The

plaintiff alleges that he told Goh three times in a row that he was experiencing severe pain and suffering symptoms of nausea. The plaintiff asserts that Goh told him to lay down in his room. The plaintiff had allegedly approached Goh with a bucket in his hand, and as he turned to leave Goh, he vomited in the bucket.

In contrast, Goh indicates that she does not remember the incident. She asserts that if an inmate complains of severe pain during her shift, she usually alerts her supervising officer and contacts HSU staff. Goh does not recall doing that in this instance and she concludes, therefore, that the plaintiff did not complain of severe pain or that Goh determined that his complaints did not rise to the level of an emergency.

There is a genuine dispute as to an issue of material fact here—whether the plaintiff approached Sergeant Goh, holding a bucket and complaining of severe pain; whether he approached her three times (which would indicate mounting and continuing pain/stress); and whether he vomited as he walked away from her (which, coupled with any evidence of severe pain, would be a warning flag). If that reasonable trier of fact were to accept the plaintiff's version of these facts, the trier could conclude that Sergeant Goh acted with deliberate indifference when she allegedly ignored the plaintiff's severe pain, nausea, and vomiting.

The remaining allegations surround the early morning of November 23—the day the plaintiff finally saw a doctor, and had the abscess diagnosed. The plaintiff alleges that during third shift in the morning of November 23, he

complained to Officer Dordel of increasing pain. Dordel allegedly told the plaintiff that all of the nurses were gone, there wasn't anything they could do, and the "only way you can get sent to the hospital on third shift is by a nurse okaying it or by passing out or bleeding."

Officer Dordel's version of the facts is different. She does not recall the incident, and she denies making the statements. The Unit Log Book for that morning indicates that Lieutenant Goh was notified of the plaintiff's complaints, and that staff monitored him.

The plaintiff also alleges that during third shift, he complained of increasing pain to Captain Blodgett, but that Blodgett refused to send the plaintiff to an outside provider, stating that OSCI has "a policy that if HSU doesn't send you out the only way I can is if you were bleeding and/or passed out." (Blodgett Decl. ¶ 5)

Captain Blodgett denies making that statement to the plaintiff. The record shows that at about 12:42 a.m., Captain Blodgett contacted Nurse Edwards and reported the plaintiff's complaint of pain. Nurse Edwards allegedly told Blodgett that off-site medical care was not necessary.

Sergeant Warner, who is not a defendant, created an incident report for that night, which confirms that the plaintiff was up and complaining of severe pain for much of the early morning hours. (Defs. Exh. 102 at 1-2)

There is a factual dispute regarding whether Dordel and Blodgett made some inaccurate and insensitive comments to the plaintiff. Even if they did make the statements, however, that fact is not material to the question of

whether they were deliberately indifferent. What is more relevant, and what makes these situations different from some of the other security officer situations discussed above, is the fact that Blodgett contacted Nurse Edwards at 12:35 a.m., and Edwards indicated that the plaintiff didn't need off-site care. The plaintiff was given his prescribed pain medication and monitored for the rest of the night. Dordel and Blodgett were entitled to, and apparently did, rely on Nurse Edwards' direction that off-site medical care was not necessary. *See King*, 680 F.3d at 1018. For that reason, even if the trier of fact were to accept the plaintiff's version of the fact, the plaintiff would not be entitled to judgment as a matter of law. The court will grant the defendants' motion for summary judgment as to Officer Dordel's November 23 conduct, and as to Officer Blodgett.

In sum, the court finds that there are genuine issues of material fact regarding the actions of Priest, Dordel (based on November 22 interaction), Logterman, and Goh, and that if a reasonable fact finder were to accept the plaintiff's version of fact, that fact finder could conclude that these defendants acted with deliberate indifference when they allegedly ignored the plaintiff's complaints of extreme pain and suffering.

### d.    Warden Judy Smith[8]

Nowhere in his complaint does the defendant allege that defendant Judy Smith had any personal involvement with the events of November 19-23, 2009.

---

[8] The plaintiff also contends that James Greer and Sarah Kropp violated his Eighth Amendment rights. However, these defendants were dismissed on May 22, 2013.

Case 2:13-cv-00137-PP   Filed 06/04/15   Page 38 of 39   Document 107

For this reason, the defendants contend that Warden Smith is entitled to summary judgment. They also assert that the nature any claim the plaintiff might have against Warden Smith is unclear.

The Seventh Circuit Court of Appeals has held on multiple occasions that "[t]o recover damages under §1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right." *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) (citing *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1248 (7th Cir. 1994)). Because Warden Smith was not personally involved in the events of November 19-23, 2009, the court dismisses her as a defendant.

### III.    CONCLUSION

For the reasons discussed above, the court **ORDERS** that the defendants' motion for summary judgment (ECF No. 85) is **GRANTED** as to defendants Judy Smith, Henry Bruneel, Wendy Carivou, Charles Huibregtse, M.D., and Rebecca Blodgett.  The court **DENIES** the motion as to defendants Tom Edwards, Sue Smith, Sergeant Goh, Sergeant Logterman, Officer Priest, and CO II Dordel.

Dated at Milwaukee this __4th__ day of June, 2015.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**United States District Judge**

Case 2:13-cv-00137-PP   Filed 06/04/15   Page 39 of 39   Document 107